IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

MARIO PEARSON,

            Plaintiff,

v.                                     CIVIL ACTION NO.   2:19-cv-00321

CAPTAIN THOMPSON, et al.,

            Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendants Ronnie Thompson, William Cabell, and Timothy Hicks' (collectively, "Defendants") Motion for Summary Judgment. (ECF No. 36.) For the reasons more fully explained below, Defendants' motion is **GRANTED** in part and **DENIED** in part.

*I.   BACKGROUND*

This action arises out of an alleged use of excessive force by correctional officers at the South Central Regional Jail (the "Jail") on October 28, 2017. Plaintiff Mario Pearson ("Plaintiff") was a recently-booked inmate at the Jail and was to be incarcerated until February 24, 2018. (ECF No. 37 at 2.) Defendants Captain Ronnie Thompson ("Captain Thompson"), Sergeant William Cabell ("Sergeant Cabell") , and Corporal Timothy Hicks ("Corporal Hicks") are all correctional officers employed by the West Virginia Regional Jail and Correctional Facility Authority and were assigned to the Jail. (*Id.* at 1.)

During the booking process, Plaintiff was examined by a nurse who conducted a suicide screening. (ECF No. 36–2, Ex. B.) For the protection of private health and medical information, Plaintiff's assessment was not disclosed to Jail personnel. (ECF No. 37 at 2.) However, based on Plaintiff's assessment, the nurse recommended to the booking officer that Plaintiff be placed on suicide watch. (*Id.*) A mistake was made, though, and Plaintiff was initially housed in general population. (*Id.* at 3.) Upon discovering the mistake, Plaintiff was brought to an interview room where Sergeant Cabell informed Plaintiff he was to be moved to suicide watch and needed to change into a suicide smock. (*Id.*) According to Defendants, Plaintiff became argumentative at this time, denied being suicidal, yelled at the officers, and attempted to flip the table in the interview room. (*Id.*) De-escalation attempts by the officers failed, and Corporal Hicks then sprayed Plaintiff in the face with two one-half second bursts of Oleoresin Capsicum ("OC"). (*Id.*) Plaintiff, however, denies that he was "combative," but concedes that he was verbally arguing with Corporal Hicks over Plaintiff's placement on suicide watch. (ECF No. 39 at 2.) Plaintiff contends that Corporal Hicks used the OC spray on Plaintiff "for simply arguing over their intention to place plaintiff on suicide watch." (*Id.*)

Following Corporal Hicks's use of OC spray, Captain Thompson ordered the officers to close the door to the interview room to allow the OC to take effect. (*Id.*) Once Plaintiff was subdued by the spray, the officers removed Plaintiff without further use of force and took him to decontamination. (*Id.*) Plaintiff asserts that he was left in the cell for approximately two hours before being moved to decontamination. (ECF No. 39 at 2.) Plaintiff was taken to the suicide watch section following decontamination.[1] (ECF No. 37 at 3.)

---

[1] Specifically, Plaintiff was taken to pod section A-7-3. (ECF No. 37 at 3.) Section A of the suicide watch is used for inmates who are monitored more closely. (*Id.*)

2

Shortly after being moved to the suicide watch section, Plaintiff removed the sprinkler head in his cell, which resulted in the flooding of the area.[2] (*Id.*) Plaintiff was removed from his cell and placed in booking so that the sprinkler could be replaced. (*Id.* at 3–4.) While in booking, Plaintiff took a shower and was given fresh clothing. (*Id.* at 4.) However, Plaintiff refused to change into a fresh suicide smock and "became belligerent and continued to act erratically." (*Id.*) Plaintiff repeatedly refused to be placed on suicide watch and stated that the officers would need to fight him. (*Id.*) Plaintiff, however, asserts that he was calm, requested medical, but was ignored. (ECF No. 39 at 3.)

After approximately 20 to 25 minutes, Captain Thompson was called to assist the officers handling Plaintiff. (ECF No. 37 at 3.) Plaintiff continued to refuse the officers' orders. (*Id.*) Plaintiff also continued to request medical assistance. (ECF No. 39 at 3.) Captain Thompson then ordered that a restrain chair be brought in, and he told Plaintiff that Plaintiff could either comply with his placement on suicide watch or would be placed in the restraint chair. (ECF No. 37 at 3.) Plaintiff continued to refuse compliance. (*Id.*) When Plaintiff did not move towards the chair, Captain Thompson sprayed Plaintiff with the OC in a single half-second burst. (*Id.*) Plaintiff immediately sat down in the restraint chair. (*Id.*) Officers then applied the restraints to Plaintiff. (*Id.*) Captain Thompson ordered another officer that once Plaintiff had become compliant, he was to move Plaintiff to decontamination and again place him on suicide watch. (*Id.*) Once Plaintiff was in the chair, Captain Thompson and Corporal Hicks left the area. (*Id.* at 5.) Plaintiff asserts that he did not threaten or act aggressively towards Captain Thompson during this period of time in booking, (ECF No. 39 at 3), but Captain Thompson stated in the

---

[2] Plaintiff states that he "popped the sprinkler head" after "unsuccessfully attempting to get officers to decontaminate him." (ECF No. 39 at 2.)

3

incident report that he feared for the safety of a nurse who was in the vicinity, despite the presence of other correctional officers. (ECF No. 39–6, Ex. F.)

Plaintiff was held in this chair for several hours. (ECF No. 36–6, Ex. F at 23.) While restrained in the chair, Plaintiff requested that he be decontaminated. (ECF No. 37 at 4; ECF No. 39 at 4.) Various officers, including Sergeant Cabell, misted Plaintiff with water in the face and neck area. (ECF No. 37 at 4–5.) During this time, both Jail personnel and the nursing staff began logging the active monitoring of Plaintiff in the chair. (*Id.* at 5.) This monitoring included checking his pulse, respiration, and blood pressure, as well as the tightness of his restraints and overall general health. (*Id.*) After Plaintiff was released from the restraint chair, he was placed on suicide watch for the next day. (*Id.*) The day after that, he was removed from suicide watch by a mental health professional. (*Id.* at 5–6.)

Plaintiff filed this action on January 30, 2019, in the Circuit Court of Kanawha County, West Virginia. (ECF No. 1–1.) Defendants removed this action to this Court on April 25, 2019, on the basis of federal question jurisdiction. (ECF No. 1.) Plaintiff asserted the following causes of action in the original complaint: assault and battery (Count I); intentional infliction of emotional distress/outrageous conduct (Count II); and violations of 18 U.S.C. § 1983 (Count IV).[3] On August 29, 2019, this Court issued an order dismissing the claim for intentional infliction of emotional distress against all defendants. (*See* ECF No. 13.) Plaintiff's remaining claims, asserted against all Defendants, are for assault and battery and violation of 42 U.S.C. § 1983.

---

[3] "Count IV" is apparently a typographical error, as no "Count III" was listed in the original complaint.

Defendants filed their motion for summary judgment on April 20, 2020. (ECF No. 36.) Plaintiff timely responded on May 4, 2020. (ECF No. 39.) Defendants filed their reply on May 11, 2020. (ECF No. 42.) As such, Defendants' motion is fully briefed and ripe for adjudication.

## II. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment. It states, in pertinent part, that a court should grant summary judgment if "there is no genuine issue as to any material fact." "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). Summary judgment should not be granted if there are factual issues that reasonably may be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Thus, at the summary judgment phase, the pertinent inquiry is whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (alteration and internal quotation marks omitted).

The nonmoving party bears the burden of showing there is a "genuine issue of material fact for trial . . . by offering 'sufficient proof in the form of admissible evidence[.]'" *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). When ruling on a motion for summary judgment, the Court must view the evidence "in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

### III. DISCUSSION

Defendants argue that they are entitled to summary judgment on all of Plaintiff's remaining claims. First, Defendants argue that Sergeant Cabell is subject to dismissal because there has been no evidence produced that he used any force, let alone excessive, against the Plaintiff. (ECF No. 37 at 8.) Next, Defendants argue that Captain Thompson and Officer Hicks are entitled to summary judgment in their favor because the force used by them in subduing Plaintiff was applied in a good-faith effort. (*Id.*) Finally, Defendants assert that they are all entitled to qualified immunity as to both the state and federal causes of action.[4] (*Id.* at 15–18.)

#### A. Sergeant Cabell

Defendants argue for the dismissal of Sergeant Cabell from this action because no evidence has been produced that he used any force against Plaintiff. (*Id.* at 8.) While Sergeant Cabell was present when Corporal Hicks first used the OC spray against Plaintiff, he did not actually disperse the spray. (*Id.*) Further, Sergeant Cabell was not present when Captain Thompson used the OC spray or during the time leading up to Plaintiff's placement into the restraint chair. (*Id.*) Therefore, Defendants maintain that Plaintiff cannot prove a "*prima facie*" case against him, thus requiring his dismissal. (*Id.*)

Plaintiff responds by arguing that Sergeant Cabell is liable "because he was present to hear the pleas of plaintiff that the O.C. was burning him." (ECF No. 39 at 13.) Instead of properly decontaminating him, Sergeant Cabell "misted plaintiff's face with a spray bottle," which only

---

[4] Defendants have also included an argument addressing a § 1983 claim under a theory of supervisory liability. (ECF No. 37 at 18–20.) This appears to be in error, as no cause of action was advanced by Plaintiff under supervisory liability. Therefore, the Court does not take up this argument.

6

exacerbated the burning. (*Id.*) Therefore, Plaintiff maintains that Sergeant Cabell should not be granted summary judgment in his favor.

Plaintiff has not produced any evidence that Sergeant Cabell committed an assault and battery against him. In West Virginia, a person commits an act of battery if "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." *Tolliver v. The Kroger Co.*, 498 S.E.2d 702, 711 (W. Va. 1997) (quoting Restatement (Second) of Torts § 13 (1965)). Sergeant Cabell did not use any force against Plaintiff when Corporal Hicks deployed OC spray, and he was not even present when Captain Thompson used OC spray against the Plaintiff. Therefore, Plaintiff's claim of assault and battery against Sergeant Cabell is **DISMISSED**.

Similarly, Plaintiff has failed to produce any evidence showing a genuine issue that Sergeant Cabell violated the Eighth Amendment by failing to properly decontaminate Plaintiff. In order to prevail on an Eighth Amendment claim, Plaintiff must demonstrate that (1) the "deprivation suffered or injury inflicted . . . was sufficiently serious," and (2) the "prison official acted with a sufficiently culpable state of mind." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir.1996). The latter requirement of this test is a subjective one. *Mann v. Failey*, 578 Fed. App'x 267, 272 (4th Cir. 2014). The subjective component requires a showing that the force was applied "maliciously and sadistically for the very purpose of causing harm," instead of "a good-faith effort to maintain or restore discipline." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992). While Plaintiff is correct that the deprivation of decontamination may establish a constitutional claim, the evidence against Sergeant Cabell fails in that regard. Instead, the evidence shows that Sergeant

7

Cabell even attempted to help Plaintiff while he was restrained by spraying him with water. (*See* ECF No. 37 at 4–5.) This is a far cry from the "malicious and sadistic" standard articulated by the Supreme Court in *Hudson*. Simply, Plaintiff has failed to show any genuine issue of material fact as to Sergeant Cabell. As such, Plaintiff's Eighth Amendment claim of excessive force against Sergeant Cabell must be **DISMISSED**.

Therefore, for the foregoing reasons, Defendants' motion is **GRANTED** as to Sergeant Cabell. Sergeant Cabell is hereby **DISMISSED** from this action, with prejudice.

### B. *Captain Thompson and Corporal Hicks*

As to the remaining Defendants, Defendants argue that Captain Thompson and Corporal Hicks are entitled to qualified immunity as to both the state and federal claims and that Plaintiff has failed to produce evidence that their actions were not in a good-faith effort to maintain or restore discipline. Plaintiff counters, however, that numerous genuine issues of material fact prevent this Court from granting summary judgment in favor of the remaining Defendants. (ECF No. 39 at 5–12.) The Court begins by analyzing the issue of qualified immunity.

#### 1. *Qualified Immunity*

The purpose of qualified immunity is to ensure that government officials performing discretionary functions can perform their duties "free from the specter of endless and debilitating lawsuits." *Torchinsky v. Siwinski*, 942 F.2d 257, 260 (4th Cir. 1991) (citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). When performing discretionary functions, government officials are "entitled to qualified immunity from liability for civil damages to the extent that 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Rish v. Johnson*, 131 F.3d 1092, 1095 (4th Cir. 1997) (quoting

8

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Thus, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In determining whether an official is entitled to qualified immunity, a court must consider "whether the facts alleged or shown, taken in the light most favorable to the plaintiff, establish that the police officer's actions violated a constitutional right," and "whether the right at issue was 'clearly established' at the time of the officer's conduct."  *See Meyers v. Baltimore Cnty.*, 713 F.3d 723, 731 (4th Cir. 2013).  Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

West Virginia's qualified immunity standard is modeled on the federal standard described above.  *See State v. Chase Secs., Inc.*, 424 S.E.2d 591, 595 (W. Va. 1992).  The West Virginia Supreme Court of Appeals has explained the standard as follows:

> A public executive official who is acting within the scope of his authority and is not covered by the provisions of W. Va. Code 29–12A–1 *et seq*. [the West Virginia Governmental Tort Claims and Insurance Reform Act], is entitled to qualified immunity from personal liability for official acts if the involved conduct did not violate clearly established laws of which a reasonable official would have known. There is no immunity for an executive official whose acts are fraudulent, malicious, or otherwise oppressive.

Syl. Pt. 5, *West Virginia Regional Jail and Correctional Facility Authority v. A.B.*, 766 S.E.2d 751, 755 (W. Va. 2014) (alteration in original).

In the matter at hand, the Court need not advance beyond the first prong of this analysis because there are genuine issues of material fact.  To begin, there is a significant disagreement between the parties as to whether the use of force was necessary.  For example, Defendants

9

contend that, from the start, Plaintiff was argumentative, yelling at the officers, and attempted to flip a table. (ECF Nos. 36–3 at 18–22; 36–4 at 21–26; 36–5 at 26–27.) Plaintiff, meanwhile, disputes this characterization. (*See* ECF No. 39–1 at 71:2.) Furthermore, there appears to be conflicting accounts between certain testimony and documentary evidence. For instance, Sergeant Cabell testified that the officers were outside of the interview room when Corporal Hicks first used OC Spray against Plaintiff. (ECF No. 39–8 at 22:5–6.) Meanwhile, Captain Thompson's incident report indicates that both he and Corporal Hicks were still in the interview room when Corporal Hicks deployed the OC spray. (ECF No. 39–6 at 2.) Similarly, in the second incident, Corporal Hicks stated that Plaintiff was not a threat while in booking and did not act out violently. (ECF No. 39–8 at 44:10; 46:23.) While Defendants claim to have "exhausted every possible avenue to gain compliance," (ECF No. 37 at 4), Plaintiff claims that Defendants escalated the use of force beyond "using empty hand control, . . . [and] used intermediate control tactics in response to a situation where there was no physical threat or active resistance." (ECF No. 39 at 8.)

Based on the foregoing, genuine issues of material fact exist such that the Court cannot grant summary judgment on the issue of state and federal qualified immunity. As such, Defendants' motion is **DENIED** as to the Defendants' claim of qualified immunity.

2. *Good-Faith Effort Restore Order*

The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishments. U.S. Const., amend. VIII. In the prison context, the Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (quoting *Williams*, 77 F.3d at 761). As already

10

explained by the Court, in order to prevail on an Eighth Amendment claim, Plaintiff must demonstrate that (1) the "deprivation suffered or injury inflicted . . . was sufficiently serious," and (2) the "prison official acted with a sufficiently culpable state of mind." *Williams*, 77 F.3d at 761. This analysis encompasses both an objective and a subjective element. *Id.*

To establish the objective component of this test, a plaintiff must demonstrate that "the alleged wrongdoing is objectively 'harmful enough' to establish a constitutional violation." *Hudson*, 503 U.S. at 2. The question, as applied here, is whether the officer's conduct was "objectively unreasonable" under the circumstances. *Kingsley v. Hendrickson*, 576 U.S. 396–97 (2015). Therefore, the conduct must be assessed from the perspective of a "reasonable" officer with the knowledge they actually possessed at the time, while recognizing the need of jails "to preserve internal order and discipline and to maintain institutional security." *Id.*

A plaintiff must show that an officer "acted with a 'sufficiently culpable state of mind'" that is "wantonness in the infliction of pain." *Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008). This subjective component requires a showing that the force was applied "maliciously and sadistically for the very purpose of causing harm," instead of "a good-faith effort to maintain or restore discipline." *Hudson*, 503 U.S. at 6–7. Whether the force was applied "maliciously and sadistically" or in a good-faith effort requires a court to weigh the following factors:

> [1] the need for application of force, [2] the relationship between that need and the amount of force used, [3] the threat "reasonably perceived by the responsible officials," and [4] "any efforts made to temper the severity of a forceful response."

*Whitley v. Albers*, 475 U.S. 312, 320-21 (1986), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010).

11

However, and as explained above, there exist genuine issues of material fact in this matter that prevent the Court from deciding this issue. To begin, the parties dispute the events such that it is impossible for the Court to determine if there was a need for the application of force. On one hand, the Plaintiff testified and points to evidence indicating that he was merely argumentative with the officers about being placed on suicide watch, (ECF No. 39–1 at 71:2), while on the other, Defendants assert that Plaintiff was cursing and flipped a table. (ECF Nos. 36–3 at 18–22; 36–4 at 21–26; 36–5 at 26–27.) Furthermore, as to the second factor, while the officers maintained that they "exhausted every possible avenue to gain compliance," Plaintiff testified that the Defendants inappropriately escalated the amount of force beyond what was needed. (ECF No. 39 at 8.) Naturally, the dispute of fact revolving on the level of force used affects the Court's analysis on the third *Whitley* factor as well. Simply, genuine issues of material fact prevent the Court from engaging in this analysis, and those issues must be decided by the fact-finder.

Based on the foregoing, genuine issues of material fact exist such that the Court cannot grant summary judgment on Plaintiff's Eighth Amendment claim of excessive force. As such, Defendants' motion is **DENIED**.

### IV. CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** Defendants' Motion for Summary Judgment on all Plaintiff's claims asserted against Sergeant Cabell. The Court further **DENIES IN PART** the Defendants' Motion for Summary Judgment on all remaining claims asserted against Defendants Thompson and Hicks. The Court **ORDERS** that Defendant Cabell be **DISMISSED** from this action with prejudice.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

                ENTER:       August 21, 2020

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE